James CATALDO, Plaintiff,

v.

BRUNSWICK CORP., Defendant.

No. 65 Civ. 769.

United States District Court,
S. D. New York.

Sept. 15, 1975.

Alan Leonard Levy, New York City, for plaintiff.

Geoghan, Tutrone & Grossman, New York City, for defendant.

OPINION AND ORDER

OWEN, District Judge.

Defendant Brunswick Corporation moves after a jury trial for judgment notwithstanding the verdict.

On an evening in 1964, plaintiff James Cataldo, employed as a maintenance man at Plander Lanes, a bowling alley in Long Island, was moving a five-gallon drum of defendant Brunswick Corporation's bowling alley lacquer from his work room to another place of storage. The lacquer, "Luster-Kote with Score X", was an inflammable mixture. Because of its properties, Brunswick, when engaged to resurface an alley

would notify the proprietor in writing that during the time of its application, among other precautions, there should be no smoking, no open flames and no electrical equipment running that could cause ignition. The drum bore, among others, the following warnings: "Caution—Flammable Mixture. Do not use near fire or flame." "Do not drop." "Leaking packages must be removed to a safe place."

The unopened drum involved in this action had not been used in a recent alley resurfacing and had been stored in Cataldo's work room behind the lanes by a Plander Lanes porter on a chest-high shelf. On the wall behind the shelf were some large nails projecting upwards designed to fit into the bottom of and hold up reconditioned bowling pins while drying after being varnished. Apparently, the can had been placed there with such force that one such nail had pierced the side of the can, acting however as a "cork" in the hole until Cataldo pulled the can away from the wall to carry it to another room.[1] He took a number of steps with the can held against his chest. The contents flowed all over his hands and chest with a "greasy feeling" and he became "soaking wet . . ." At that point the can slipped out of his grasp, hit the floor and there was an explosion. He was terribly burned as a consequence, required a number of skin grafts and suffered substantial permanent injury, especially to one hand. The jury awarded $750,000 damages.

Brunswick, in moving for judgment notwithstanding the verdict, asserts that there was no evidence to support the jury's finding of liability. Because of the clearly unreliable, indeed untrustworthy quality of the plaintiff's "expert" witness, one Felix Konstandt,[2] this verdict must be set aside and a new trial granted in the interests of justice pursuant to Fed.R.Civ.P. 59.

There is no question that absent the "expert's" testimony, a directed verdict for the defendant would have been compelled at the close of the plaintiff's case. Fed.R.Civ.P. 59(a). I find from a painstaking examination of the trial minutes that Konstandt's testimony, in which initially he proffered, later abandoned and yet later returned to a chronologically impossible theory of the cause of the explosion and fire,[3] was so replete with error, mis-assumptions of underlying fact, corrections, erroneous explanations, inconsistent positions and blatant flaws of recollection, if not worse, going to general credibility as to make the verdict in this case, based on his testimony, in my opinion, a miscarriage of justice.

It is well established in such cases as *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir. 1941) and *Cone v. West Virginia Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947), that it is the duty of the Trial Judge to set aside the verdict and grant a new trial if, in his considered opinion, the verdict effects a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.[4]

It is perfectly clear that the plaintiff's case was premised on the theory that the explosion was caused by the

---

1. Plaintiff did not press a contention on the trial that Brunswick should have made a stronger-walled can (Tr. 434–6), nor was there any claim that the drum was leaking before it was pulled away from the wall by Cataldo (Tr. 843–5).

2. Plaintiff's counsel initially qualified Konstandt only in the field of chemistry (see fn. p. 603, *infra*), knowledgeable and experienced as to paints and consultant to certain governernment agencies, firms in the paint field and attorneys with litigation (Tr. 377–80).

3. Compare Tr. 414 and 476–7 with 501 and 651–2.

4. Here, the proof, in my judgment, was so far from substantial as to raise serious questions as to its sufficiency. However, I cannot say that on Konstandt's testimony, given its most favorable construction, there was *utterly* no basis for the jury's verdict.

can hitting the concrete floor simultaneously causing a spark and the bottom to break open and the spark thereafter igniting the vapors arising from the fluid that thereafter poured out of the can. (Tr. 405, 415, 496–7). Konstandt was so certain of this theory that he testified that there was virtually no leakage from the can (Tr. 651–2) and that this explosion would have occurred from the dropping of the can even had there been no hole and no leakage (Tr. 496–7). However, this theory, it became apparent, was based upon factual premises Konstandt had made which were materially at variance from the facts established by the testimony of both Cataldo and the fire marshal. Thus, Cataldo had testified in a deposition, which was read into the record, that before he dropped the can he became wet "all over my hands and my chest. It felt really actually cold and wet and greasy feeling . . . I felt wet, soaking wet," (Tr. 654). Konstandt's opinion, however, had as its premise that virtually no liquid had come from the can. When the lack of foundation for this premise became the subject of cross-examination, Konstandt endeavored to defend his opinion by rejecting Cataldo's testimony as to his wetness as being "subjective".[5] Further, Konstandt paid no attention whatsoever to the testimony of the fire marshal who had inspected the very can and found evidence of an explosion *from the inside* with a ballooning of the top of the can and the bottom seam of the can being opened down by some force (Tr. 413). Konstandt rejected this physical fact to arrive at his conclusion since ignition entering the can through the hole and exploding inside would

more likely put responsibility on Plander, and plaintiff's case against Brunswick was premised on the claim that upon impact there was a spark, the bottom had fallen off the can, liquid had spilled out, and vapors which arose were ignited (Tr. 496–7, 651–2). Significant is the fact that Konstandt at one point in his cross-examination abandoned the "simultaneous" theory when confronted with the obvious impossibility of the spark having had time before its immediate extinguishment to ignite any vapor that would have arisen from the liquid that would have come from the bottom of the can after it broke open. Konstandt thereupon changed his opinion and for the first time testified that the spark ignited the fumes from the spillage from the leak and then was fed from the liquid that came from the bottom of the can after the bottom broke off (Tr. 501). This theory still would not account for the fact that the can showed evidence of an internal explosion, and indeed Konstandt so vascillated on this subject that he later abandoned even this second theory to return to his already discredited first theory. (Compare Tr. 414, 501, 651–2).

Not only was Konstandt demonstrably unreliable and unpersuasive as to his basic theory, but also he demonstrated in certain other areas, one of which was highly material, either such faultiness of memory or intent to color the facts as to add further substantial question to the reliability of his testimony.

At the outset, Konstandt testified to obtaining a flashpoint with regard to the lacquer in question.[6] On direct examination he testified that he had made

5. Konstandt's refusal to accept the fact that there was any significant leakage from the hole in the can, notwithstanding Cataldo's testimony (Tr. 651–2, 654–8), was apparently because Konstandt was advocating that the can was inadequate and had broken releasing the materials for combustion, and therefore Brunswick was liable. His "opinion" was thus designed to eliminate from the

case the existence of any ignitable vapors caused by Cataldo being "soaking wet" from the nail hole caused by a Plander Lanes porter for which Brunswick would not be responsible.

6. The flashpoint is the lowest temperature at which a liquid will emit vapors above its surface which when combined with air forms a combustible mixture.

the flashpoint determination in this case using the "Tag *Open* Cup" test which he testified was "standard in the industry" (Tr. 387). However, on cross-examination he firmly testified that he used the "Tag *Closed* Cup" test ". . . as specified by the AMC Association" (Tr. 476) and when pressed by astonished defense counsel on the fact that he had just said "Closed" rather than "Open" cup, Konstandt testified that open cup was not acceptable (Tr. 476) and affirmatively stated, "You would not use [the Open cup] for this material." (Tr. 477). He said that one would get a different reading as to the flashpoint depending on which test was used. Such diametrically opposed answers on a material matter, each allegedly supported by either "industry" or "association" standards hardly engenders confidence in other conclusions that he reached, especially where he had rejected uncontradicted evidence in the record in arriving

at his opinion favorable to the plaintiff's case against Brunswick.[7]

Next, Konstandt testified that the bottom of this can was crimped rather than welded, and that it should have been welded.[8] Konstandt personally drew on the courtroom blackboard a representation of what the bottom of this can looked like as a crimped can (Tr. 439). That representation was as follows:

That drawing remained on the blackboard before the jury throughout the two days of Konstandt's testimony.

Concerned about the possible over-simplicity of this drawing and the erro-

7. Konstandt's general credibility was further impaired in areas not squarely touching on the merits. Thus, plaintiff proffered him as an expert on the issue of the alleged inadequate construction of the container. He testified as follows (Tr. 416–7):

A. . . . The crimped can upon impact has a much greater probability of losing its integrity and breaking on impact than does a welded can. This is a fact.

Q. Whether or not that can be read by someone in the literature, you yourself have done no tests whatever?

A. No . . . We have done no testing.

Q. You have done no testing at all to determine this fact?

A. Correct.

On the basis of this I declined to permit him to testify as an expert in this area. After much agitation by plaintiff's counsel, and upon further questioning, however, Konstandt testified (Tr. 438–9):

A. About eight or nine years ago . . . . [W]e conducted some impact testing, which is dropping containers filled with this material, various types of containers of various construction from different heights on to concrete floors, and explosions resulted . . . Cans that were dropped were examined by us and others to ascertain which would be a safe can for this particular liquid or liquids in question.

Q. In connection with that work was it necessary to examine the seams of the cans?

A. Yes, the seams as well as what did this explosion cause in the construction of the can or the container.

Q. After you made these tests did you advise anyone in regard to this?

A. Yes, we wrote a report . . .

The fact that Konstandt's recollection of this testing came after he was aware that he was otherwise disqualified as an "expert" in this field puts this testimony under some cloud.

Further, Konstandt endeavored to present himself in an equal light as between plaintiffs and defendants by testifying on cross examination that he had testified for both plaintiffs and defendants in the preceding three months. When pressed for the name of any defendant for whom he had testified, and being required to recite the cases in which he had testified, it appeared that Konstandt had not only not testified for any defendant in the prior three months, but in fact had not testified for a defendant in the prior year and could not recall testifying for a defendant prior to that.

8. There was, however, no testimony that had there been welding, this bottom would not have come off, even on Konstandt's theory.

neous conclusion the jury might draw as to the patent inadequacy of such construction, were it not as represented, and having a sample can in evidence, I ordered government employees to cut a notch in the bottom with a hacksaw. This revealed, although one had to look sharply because the metal was pressed together, that the crimping was not at all what Mr. Konstandt had drawn upon the blackboard but was as follows [9]:

While I do not conclude that Konstandt deliberately intended to mislead the jury by his erroneous drawing or his inaccurate testimonial description, at the very least it was the height of carelessness or lack of knowledge on a critical issue, and certainly the effect was to give the jury an unwarranted impression of a can that upon the slightest impact would break open.[10]

Finally, Konstandt testified that the warning labels on the can were

inadequate.[11] Painted on the side of the can were the words in large letters: "CAUTION—FLAMMABLE MIXTURE. DO NOT USE NEAR FIRE OR FLAME." Also on the can was a diamond-shaped red label with black printing as required by the Interstate Commerce Commission, reading: "KEEP AWAY FROM FIRE, HEAT AND OPEN-FLAME LIGHTS—CAUTION—LEAKING PACKAGES MUST BE REMOVED TO A SAFE PLACE— DO NOT DROP." [12] Konstandt, disregarding the existence of the diamond-shaped label, stated that in his opinion the painted label was inadequate. He testified that the word "Caution" should have been "Danger!" He testified that in addition to stating "Do Not Use Near Fire or Flame" it should have the word "Spark" added. He further testified that the label should have included "Vapors when mixed with air form a combustible mixture."

Konstandt, however, conceded that the diamond-shaped label not only conformed with the requirements of the Interstate Commerce Commission (Tr. p. 623):

A. In my direct testimony yesterday I addressed myself to the three line wording on the back of the can, Exhibit 7, which states cau-

---

9. Even Konstandt's testimonial description of the crimping was inaccurate (Tr. 440):
   A. We have two pieces of metal, one piece of metal on the top and one piece of metal on the bottom. By means of a die and a machine, the top piece of metal is bent into a U-shape, the bottom piece of metal is bent in a similar U-shape. Those two surfaces are now interlocked within these two U's and force is applied by means of a roller on both sides that compresses this seam together, so when we are finished we have four pieces of metal next to each other in close proximity with a tight seam formed around it.
   The actual crimping is U-shaped for the sides but is a circle and-a-half for the bottom section, thus putting *five* pieces of metal next to each other, one completely interlocked.

10. Whether the jury's erroneous impression of the alleged inadequacy of the crimping

gleaned from Konstandt's drawing and testimony was overcome by later cutting open the bottom of a can, given the fact that the intertwined pieces were pressed into almost one piece of metal, I am unable to say. However, from my personal scrutiny of the can, it is hard to see how the seam on the bottom could have opened from at most a three foot fall.

11. However, there was nothing more than speculation to support a conclusion that the fire was caused by the allegedly inadequate warnings.

12. The fact that this label fully complied with ICC regulations for this product, while being some evidence of its adequacy, is not necessarily conclusive, *Phillips v. Roux Labs,* 286 App.Div. 549, 145 N.Y.S.2d 449 (1st Dep't., 1955).

tion, flammable mixture; do not use near fire or flame. It is that legend on the can which I found was inadequate. We're not talking about Exhibit 8, which exhibits the red cargo label, which is more than adequate and meets the ICC regulations.

but also that the ICC warnings were adequate for those handling the drums in commerce. In response to some questions by the Court, he testified as follows (Tr. 662):

Q. You said that this diamond shaped red label is only addressed to the commerce phase of this product?

A. Correct.

Q. To whom is it addressed in that commerce phase?

A. To the shipper, to the man who handled that particular cargo from one point to another. He picks it up at the point of manufacture and delivers to a warehouse. He is the one who has to segregate the cargo according to these labels.

Q. I believe you said in the commerce phase the diamond shaped label here was an adequate warning?

A. Correct.

Q. And you say that is addressed to the person who is carrying that can in and out of the boxcar, for example, and in and out of the warehouse?

A. Correct.

It never was explained why a warning that Konstandt said was adequate for a man carrying this drum in and out of a boxcar or a warehouse is inadequate for a man carrying it out of one storage room to put it into another.[13]

An "expert" witness is selected and engaged by a party to testify on that party's behalf. Needless to say, an expert who proposed to testify to a party's damage would not be engaged or proffered.[14] Heretofore and as now codified in Rule 702, Federal Rules of Evidence, such an expert witness has been permitted to testify only if his ". . . scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue . . . ." This, on the other hand, does not permit a witness, however qualified by ". . . knowledge, skill, experience, training, or education . . .",[15] to utter words of "opinion" compelling submission of a cause to a jury, regardless of how patently impossible, erroneous or factually ill-founded the "opinion" may be.

Given all the foregoing, I cannot permit a verdict based solely upon such untrustworthy and unreliable "expert" testimony to stand.

Accordingly the jury's verdict rendered herein is set aside and the action is placed upon the trial calendar for a new trial, on a date to be determined.

13. There is no question that Konstandt intended to answer in this irreconcilable fashion (Tr. 624):
Q. . . . The word caution is on the red [ICC] label?
A. Yes, it is.
Q. You find no fault with that?
A. No, I don't.
Q. The word caution is [painted] on the back of the can? You find no fault with that?
A. Yes, I do.
Q. The words Keep Away From Fire, Heat and Open Flame, Lights, is on the warning label. You find no fault with that?
A. No, I don't.
Q. On the back it says Flammable Mixture; do not use near fire or flame. You find no fault with that?
A. Yes, I do.
Q. And these are all of the same can?
A. Yes.

14. This is not to say that on some issues reasonable experts may, and do, differ.

15. Rule 702.